SUPREME COURT. Albany General Term, September, 1864.
*Peckham, Miller* and *Ingalls*, Justices.

## WILLIAM WILLIS, plaintiff in error, *v.* THE PEOPLE, defendants in error.

On the trial of an indictment for murder, the defense interposed was insanity. The judge charged, "that a man is not insane who knows right from wrong; who knows the act he is committing is a violation of law, and wrong in itself." *Held,* on review, that the charge was not erroneous.

Charge of Mr. Justice PECKHAM on a trial for murder.

Where there has been a conviction in a Court of Oyer and Terminer, and judgment has been stayed, the proceedings may be removed into the Supreme Court for review by *certiorari:* Where there has been a conviction and judgment, the proceedings can be removed into the Supreme Court for review, only by writ of error.

The Supreme Court has no jurisdiction to entertain a motion for a new trial, on the ground of an irregularity which does not appear upon the record; but, after a writ of error has been returned, and not before, affidavits may be read upon the argument to correct an error arising out of an irregularity prejudicial to the rights of the prisoner, which does not appear on the record, and where he has no other legal mode of redress. Per INGALLS, J.

But a conviction will not be set aside and a new trial granted, when it is apparent that no injury has resulted to the prisoner from the alleged irregularity.

A writ of error having been brought, and a return made after conviction and sentence, in a capital case, affidavits were presented tending to show that S., one of the jurors, who had agreed to the verdict of guilty, had, before the trial, expressed the opinion that the prisoner was guilty and ought to suffer death; and that such expression of opinion was unknown to the prisoner and his counsel at the time of the trial. In opposition, the affidavit of the juror was read, denying fully and explicitly that he had ever formed or expressed any opinion, and other affidavits were read in corroboration. Upon a full examination of the affidavits, it was held that there was no ground for complaint on the part of the prisoner, and the application was denied and the judgment affirmed.

THE prisoner was indicted for the murder of Mary E. Phelan, and pleaded not guilty. The trial took place at the Ulster Oyer and Terminer, in March, 1864, Mr. Justice PECKHAM, presiding.

The killing of Mrs. Phelan by the prisoner on the 9th of April, 1863, near Ellenville, in the county of Ulster, was

clearly proved. Her death was caused by cutting her throat with a knife. The physician who examined the deceased after death testified: "The wound was in her neck, from ear to ear, cutting the blood vessel, æsophagus, the trachea, both jugular veins, the external and internal carotid arteries, cutting down almost to the vertebræ; by looking at the trachea, there were at least three gashes."

The leading facts of the case, and the nature of the defense attempted, sufficiently appear from the charge of the judge and the opinion of the court.

After the testimony was closed, the court charged the jury as follows:

The prisoner at the bar, gentlemen, stands indicted and is now on trial before you for the murder of Mary Phelan. Such trials, gentlemen, are always serious, whether contested or not, however plain, however clear. They are always painful, and they are solemn — solemn in their results and solemn in their investigation. But, however painful, it is our duty to go through with the examination with calmness and coolness, and come to the result that the evidence in the case requires. In this case there is really very little difference in the evidence, scarcely any contrariety of testimony before you. That this woman has been killed is admitted and proved. That this prisoner was the cause of her death, that he killed her, is also proved beyond all question, and not denied. The offense, then, by the people, is *prima facie* made out; and the question arises on the part of the prisoner, what is the defense to this charge? Well, the defense has set up, so far as it may be discovered from the evidence and arguments of counsel, his insanity. Insanity, gentlemen, can never be based upon supposition, upon fancy, upon mere allegation. It must be based upon proof; it must be based upon testimony. Like every other defense known in the law, insanity must be based upon evidence.

Now, what is the evidence of this insanity? You must coolly and calmly investigate it, and determine whether it has an existence here as a defense. If it has, you must give it

force; if it has not, you will pronounce against it. Now, the first evidence, so far as I understand, is, that this man is more than usually excitable, more than usually impulsive. I am bound to tell you as matter of law, that the mere fact of the prisoner being more than usually excitable, that he is more liable to be irritated than the generality of men, that he has a more irascible temper than men generally have, is not evidence of insanity. It certainly is not insanity. It can scarcely be evidence of insanity; it must be regarded, if at all, as evidence of the condition of a man more easily becoming insane, more liable to become insane, not however of insanity itself. What other evidence is there in the case? Why, it is alleged the act itself evinces insanity. Well, gentlemen, I hardly think it necessary to define to you what insanity is; I think you understand it. A person is not insane surely, who knows right from wrong, and who knows that the act he is committing is a violation of law, and is wrong in itself. If he is conscious that the act is wrong at the time he is committing it, that is a violation of law, that is a violation of the laws of the land; he cannot be said to be insane. If, however, at the time he commits the act he is under a delusion, he does not know right from wrong, he does not know that the act he commits is an offense, he does not know that it is wrong, but is under a delusion in regard to it, why surely he is not responsible for his acts, he is an insane man.

Now as to the facts of this case: It seems that this man Willis had been engaged to the deceased in the relation of accepted suitor. He had an apprehension while at the south that there might be some disturbance, some misfortune occurring to him, that he might not attain the end that he desired, that he might never enjoy her as his wife. It is insisted on the part of the people, that having this murder then in mind, he uttered these threats; that upon its being suggested to him, he remarked that if he did not marry her, if another man married her, the honeymoon would be short, and he would not want to live after. Well, it appears that he afterward returned to this county, remained here for some time

and indulged in some excesses. Then he returns again south, and from there writes a letter stating that he regretted exceedingly the course of life he had adopted while at home in Ulster county. He also adds that if she was to leave him —leave him for this cause — he should not blame her, but regret it very much, and should love her still. But if she should take another, he could not blame her. That is the substance of the Alexandria letter if we may so term it. Then he comes to this county again, some time in the winter, and remains here up to the day of the tragedy. From sometime in September or October the husband of the deceased commences to pay his attentions in the character of a suitor. That goes on until April, and on the 4th of April he is married to her. The prisoner hears of his attentions some two or three weeks before the marriage. He hears of his riding out with her, and he speaks of it in a very excited manner; that it cannot be true; that it is impossible. But afterward he finds that it is true, and that he is sorry that he ascertained it. He appears a good deal excited about it. You would suppose it quite natural, if a man had any regard for a woman, that he would be excited when she abandoned him, whether giving any cause for so doing or not. The very fact that she is abandoning him, and looking in another direction and advising him to the contrary, we should naturally say was good cause for him to be excited. Then, on the 4th of April, she is married to another man. He hears of it and does not believe it. On the Tuesday preceding the catastrophe he becomes satisfied that it is true, and states to his employer, Mr. Houston, that it is true. It grieves him very much, as it is natural to suppose; he sheds tears over it a number of times. He keeps on the next day in his usual avocation, and on Thursday morning after, as he says, having had this subject in his mind, he goes forth twice with a view of committing this offense. But his courage failed, and he returned each time. On Thursday morning, the 9th of April, he goes there with the knife he borrowed of this man Cointot; he goes there with the knife in his pocket, and in the manner de-

scribed to you by the witness, seizes this woman and cuts her throat repeatedly until she is dead.

Now, gentlemen, this is the act that is regarded as an act of insanity. I may go a little further, however. After doing that he goes out, and going to the husband of the deceased with the bloody knife, says: "You, I am a murderer." He then leaves, is pursued, and, when about to be overtaken, surrenders himself — says that he will not attempt to escape, and desires no man to pursue or arrest him. Now this is the act which is regarded and claimed as an evidence of insanity. It is not the province of the court to state that it is or is not; it is a matter for you to determine. I am not aware that there has ever been a case, which the law has held as a case of insanity, where there has not been delusion. Was there any delusion here? Did not this man know that he was going to kill this woman? Did he kill her intentionally? After it was done did he avow it? Did he express on some occasion contrition for it? At other times did he not say that he was willing to suffer for it — he had done this deed, and if he had seven lives to lose he would do it again? It was said that this was done so openly, so defiantly, that therefore it should be regarded as an act of insanity.

Well, gentlemen, that would depend again upon the temperament and character of the individual who commits the offense; it would depend somewhat upon the condition of his mind. The prisoner, it appears, said, when he was at the south, that if she married another than himself, that the honeymoon would be brief, and he would not want to live after it. It seems that he had been somewhat dissipated, and was so up to the week of this occurrence. It is for you to say whether, as it was contended by the counsel for the people, he was just in that state of mind of a man who indulged too freely — indulged too much in various ways — to commit crime; and when this anticipated marriage, which he had looked forward to with hope, came to him as a misfortune, he turned round, and, ready to avenge himself for the outrage

committed upon his happiness, take her life, and at the same time terminate his own career.

It must be a very strange case, gentlemen, to say the least of it—a case which has never come under my observation in the books, that the act itself, when a motive accompanies it (if you believe there was a motive here for revenge), can be regarded as a case of insanity. In some cases one man commits an offense openly; another does it secretly—depending very much, of course, upon the nature and character of the man, his boldness and his recklessness, his cowardice and his meanness, and his desire to shrink from the consequences of the act. We hear of cases sometimes of a man having in confidence declared hostility against a certain individual, or even openly declared, and he arms himself, meets him and shoots him on sight. We hear of another who arms himself and waylays his enemy secretly in the woods, and shoots him behind the back, when no man sees him. But the one offense is just the same as the other in law.

Now, gentlemen, I have not deemed it important to define murder to you, which is really the killing of a human being with premeditation — with design — purposely. That this killing was purposed, was intended, is clear and undenied. It was intended to be done, and the only question is, was this man insane—insane when he did the act? I have alluded to all that I deem it important to possess you of this case, because it is in a nut-shell, so far as it regards its evidence; and it is for you to pass judgment with a just responsibility to yourselves and to the country. It is always a desirable thing for a right minded man to obtain by his conduct the good opinion of his fellow men; but it is a higher motive still, far higher, that he obtains his own good opinion—that he obtains the approbation of his own conscience in the discharge of his duty—that he so demean himself as a public officer that he secures the approbation of his own conscience.

Now, gentlemen, our duty is simply, upon this subject, to pronounce upon this issue: Is this man guilty or not guilty of this charge? Pardon is no part of our province; that belongs

Willis *v.* The People.

to another branch of the government. Its exercise may be pleasant and gratifying, but it is not for us to exercise. Jurors sometimes obtain an idea that they may acquit a man even though the evidence requires his conviction — that they *may* do it, and that they have done hardly anything which should be condemned. In truth, gentlemen, any officer of the law, any juror who deliberately and willfully acquits a man when the evidence pronounces him guilty, is equally guilty of a violation of duty as if he condemned the innocent. I leave this case in your hands to dispose of it as honest men, and render such verdict as the evidence requires.

The counsel for the prisoner excepted to so much of the charge of the court as held that a man is not insane who knows right from wrong, and who knows that the act he is committing is a violation of law and wrong in itself.

The jury found the prisoner guilty of murder in the first degree.

The counsel for the prisoner then moved the court to set aside the verdict for the reasons stated in the following affidavits:

ULSTER OYER AND TERMINER.

| The People of the State of New York |
| *v.* |
| William Willis. |

*Ulster County, ss:*

*William H. Felter*, of Kingston, in said county, being duly sworn, says: That he is well acquainted with Smith H. Shaw, one of the persons who was a juror upon the trial of the above mentioned indictment; that, during the month of November last past, the said Shaw had a discussion with deponent in regard to the trial of the said Willis, and the act of which he stood accused; that the said Shaw mainly contended that the said Willis should suffer death for the alleged offense, and, according to deponent's best recollection, said that if he (Shaw) was on the jury which tried him, he would certainly hang him.

WILLIAM H. FELTER.

Sworn before me, this 2d } day of April, 1864, }

JACOB FREILEWEH, *Notary Public, U. C.*

COURT OF OYER AND TERMINER.

| The People of the State of New York *v.* William Willis. |
|---|

*Ulster County, ss :*

*Henry H. Jones* and *Hyman Houghtaling*, of Kingston, in said county, being sworn says : That during the present week, and previous to the impanneling of a jury in the above cause, they heard *Smith H. Shaw*, one of the jurors who served in the above cause, express his opinion in regard to the above case ; and the said Shaw gave it as his opinion that the said William Willis deserved to, and ought to suffer death for the act which he had committed.

HYMAN HOUGHTALING,<br>HENRY H. JONES.

Sworn before me, this 2d
day of April, 1864,

J. J. SNYDER, *Justice of the Peace.*

ULSTER OYER AND TERMINER.

| The People *v.* William Willis. |
|---|

*Ulster County, ss :*

*Theoderic R. Westbrook, Erastus Cooke* and *William Willis*, being sworn, say : That the first two above named were the counsel for the prisoner, on the trial of the above indictment, and that the latter is the person who was found guilty of the murder of Mrs. Phelan, that neither of deponents knew that Smith H. Shaw, the juror who is mentioned in annexed in affidavits had formed or expressed any opinion in this cause until after the said trial ; that the said Shaw denied on being examined upon his challenge as a juror, that he had formed or expressed any opinion therein.

T. R. WESTBROOK,<br>WILLIAM WILLIS,<br>E. COOKE.

Sworn before me, this 2d
day of April, 1864,

H. W. TIBBALS, *Clerk.*

The district attorney read the following affidavits in opposition to such motion, to wit :

Willis *v.* The People.

OYER AND TERMINER. ·

| People<br>*v.*<br>William Willis. | |
|---|---|

*Smith H. Shaw*, being duly sworn, says: That he has heard read the affidavit of William H. Felter; that deponent never, neither in November last, or at any other time, said to said Felter, either in substance or form, what is alleged in said Felter's affidavit.

Deponent further says, that he had heard read the affidavits of Hyman Houghtaling and Henry H. Jones; that deponent· recollects the conversation that deponent had with Houghtaling and Jones, referred to in said affidavit; that deponent did not therein express his opinion that William Willis deserved to and ought to suffer death for the act which he had committed as is alleged in said affidavit.

That deponent might have said that if he, the prisoner, was proven guilty, then he ought to be punished, but nothing more. Deponent further says that he had never, prior to the trial of William Willis, either formed or expressed in any way his opinion as to the guilt or innocence of the accused.

Sworn before me, this 2d day of April, 1864,       S. H. SHAW.

H. W. TIBBALS, *Clerk.*

OYER AND TERMINER ·

| The People<br>*v.*<br>William Willis. | |
|---|---|

*Henry H. Holden*, being duly sworn, says: That he was the foreman of the jury on the trial of William Willis; that the jury, after retiring, individually agreed upon their verdict; that there was not the slightest difference of opinion among the jurors about the guilt of the said Willis, and that Smith H. Shaw had no influence in the deliberations of the jury, and took no part in the rendering of the verdict, except giving his assent thereto.       H. H. HOLDEN.

Sworn before me, this 2d day of April, 1864,

H. W. TIBBALS.

The court denied the said motion upon the grounds, 1st. That the Court of Oyer and Terminer had no power to grant a new trial.   2d. If it had, then upon the merits; to which decision the counsel for the prisoner excepted.

The prisoner was sentenced to be executed, and an order to stay proceedings having been obtained, a writ of error was brought, and the record removed into this court.

Several additional affidavits, which were not read before the Court of Oyer and Terminer, were also inserted in the case. These affidavits related to the question whether the juror, Shaw, had expressed an opinion before the trial.   Their substance is sufficiently stated in the opinion of the court.

*T. R. Westbrook* and *E. Cooke*, for the prisoner.

I. The judge erred in charging the jury, "that if he is conscious that the act is wrong at the time he is committing it, that is a violation of law, *that is a violation of the laws of the land*, he cannot be said to be insane."

The error in the charge consists in stating to the jury that a person can be convicted of crime who is conscious that the act is forbidden by *human* laws; in other words, that a person who knows that "the laws of the land pronounce the act he commits to be a crime, then such person is amenable to the laws he has violated, although a diseased mind told him that the laws of God *required* him to commit the act in defiance of the human enactment."

It is evident that the rule laid down by the court would condemn as criminals a large class of insane persons who ought not to be held accountable.   Take, for example, the case of a *religious* enthusiast, who *fancies* that the Supreme Being has commanded him to do a certain act.   It is evident that in regard to the existence of such a command his mind is diseased, though he has reason sufficient to tell him that the "laws of the *land*" forbid its commission, yet if he yields, as he erroneously supposes, to the higher authority, is he an accountable being?   It is respectfully submitted, upon both reason and authority, that he cannot be.

Willis *v.* The People.

In *Bellingham's Case*, quoted by BARCULO, J., in *People* v *Pine* (2 *Barb. R.*, 570, 571), Lord MANSFIELD thus laid down the rule: "It must be proved, beyond all doubt, that at the time he committed the atrocious act with which he stood charged, he did not consider that murder was a crime against the laws of ' *God and man.*'"

Judge BARCULO, in the same case, on page 571, says: "Lord LYNDHURST, in *Rex* v. *Offord*, put this question: Did the prisoner know that in doing the act he offended against the laws of *God and man?*"

In *Chitty's Medical Jurisprudence*, 354, the doctrine is thus stated: "In practice, to prevent the jury from being embarrassed by any technicalities respecting the import of the term insane, the substantial question presented to the jury in this and all cases, whether of alleged idiocy, lunacy or insanity, either in general or in monomania (that is, delusion confined to a particular subject), is whether, at the time the alleged criminal act was committed, the prisoner was incapable of judging between right and wrong, and did not then know he was committing an offense against ' *the laws of God and of nature.*'"

II. The juror, Smith H. Shaw, having declared to William H. Felter, in November, previous to the trial, that "Willis should suffer death for the alleged offense, and that if he, Shaw, was on the jury which tried him he would certainly hang him;" and having also declared to Hyman Houghtailing, Henry H. Jones and Andrew Layman, during the week of the trial, and previous to the impanneling of a jury therein, "that the said Willis ought to and should suffer death for the killing of Mrs. Mary Phelan," the verdict should be set aside and a new trial granted.

· This point presents two others, to wit: *First*, can the court now examine this question? *Second*, if it can, should a new trial be granted on account thereof? Each of these questions will be presented under distinct and separate points.

III. The Supreme Court, at general term, has power to grant a new trial for this reason:

*First.* The writ of error removes the cause from the Oyer and Terminer into the Supreme Court, and the court having got possession of the case will hear the affidavits.

This was precisely the practice adopted in *Eastwood* v. *The People* (3 *Park. Cr. R.*, 25). The prisoner was convicted of murder at the Monroe Oyer and Terminer. After conviction, the prisoner's counsel moved the Oyer and Terminer for a new trial on account of irregularities of the jury. The motion was denied. The case was brought into the Supreme Court by writ of error, and upon affidavits showing the irregularities of the jury, a new trial was granted. The opinion was delivered by SELDEN, J., and although no point was made upon the practice, it is conceived that if any could have been made it would not have escaped the attention of the court and counsel. The case is identical with ours, both as to the motion in the Oyer and Terminer, and the subsequent practice.

The counsel for the prisoner also understood that this court, upon the previous motion in this case, decided that the motion must be made after the return to the writ of error.

*Second.* But this court has also the power to grant a new trial directly upon motion, by virtue of its general supervisory power over the acts and doings of subordinate tribunals and officers.

Matter of *Bradhurst* v. *The President and Directors of the First Great Southwestern Turnpike Road Company,* reported in 16 *Johns. R.,* page 8. This was a motion direct to the court, upon affidavits to stay the sale of certain lands upon assessments made by commissioners. It was objected that the court could not interfere by motion, but *per curiam.* "There can be no doubt of the power of the court to cause these proceedings to be brought before them. It has been frequently decided that when the legislature confer a power upon an inferior tribunal, the exercise of which may affect the rights of person or property, notwithstanding their decision may be declared to be final, yet this court, like that of the court of K. B., has a general superintending control over its proceedings. (2 *Caines R.,* 179, 182.) Nor can there be any doubt of our

power to grant a *certiorari.* The parties aggrieved have a right to that writ; and if asked for we could not refuse it. * * * Analogous cases have come before this court as to proceedings under the "act for relief against absconding and absent debtors;" and we have on motion afforded every relief which the case required; we have stayed the proceedings, and modified them according to the equity and justice of the case. (*In the matter of M'Kinley*, 1 *Johns. Cas.*, 137; *Learned* v. *Dural*, 3 *Id.*, 141, 278; *Lenox* v. *Howland*, 3 *Caines R.*, 257; 2 *Id.*, 318; 1 *Johns. R.*, 165, 174; 7 *Id.*, 248.) We have done this by virtue of our general superintending power over all such inferior jurisdictions, and we shall exercise that power in the present case."

See also *Lennox* v. *Howland* (3 *Caines R.*, 257). It was a motion to set aside proceedings on an attachment; it was objected "that the court had no jurisdiction in this summary way, as the act had chalked out the only mode of proceeding by which a supersedeas could be obtained." But the Court, per SPEN-CER, J., held, "that from the general superintending power of this court we have a right to examine whether the attachment has not improvidently issued, and on this ground review the order of the judge by whom it was directed."

IV. The Court having the power to grant a new trial in the mode we propose, we claim that the juror, Smith H. Shaw, having prejudged the case of the prisoner as shown by the expression used by him, the verdict should be set aside, and a new trial granted.

Declarations made by a juror showing a fixed determination to find a particular verdict, made prior to the impanneling of the jury, have uniformly been held to furnish good cause for setting aside a verdict. This has been repeatedly held in the State courts, the Federal courts, and also in England.

In *Robert Sellers* v. *State of Illinois* (3 *Scam. R.*, 412), it was decided: "It has always been held that if a juror prejudge a cause, and if it is unknown to the failing party in time to challenge, it is a good cause for a new trial.

On page 416, DOUGLAS, J. (the late Stephen A.), says:

PAR.—VOL. V.            80

" It is wholly immaterial, for the purpose of this motion, whether the prisoner be guilty or innocent. Law, justice, humanity, forbid that he should be deprived of his life by such means, and by a jury thus constituted."

In *Flanagan* v. *State* (7 *Watts & Serg. R.*, 415), it was held : " The expression of an opinion by a juror in regard to the guilt or innocence of a defendant, before he is called to the bar, is a good cause for challenge, but after trial .it is ·not a sufficient cause for granting a new trial. If a juror had prejudged a case, leaving his mind unopen to conviction, it would be good cause to set the verdict aside."

· *The United States* v. *Fries,* indictment for treason, reported in 3 *Dallas R.*, 515, 517 : " The facts on second ground in support of the motion for a new trial were, that Rhodes, one of the jurors, after he had been summoned as a juror, declared, at several places, at several times,' and to several persons, in substance, as follows : That he was not safe at home for these people (meaning the insurgents); that they ought all to be hung—and particularly that Fries must' be hung.  *  *  . * After a solemn consideration, IREDELL, J., delivered his opinion in favor of a new trial, on the second ground of objection, that one of the jurors had made declarations, as well in relation to the prisoner personally, as to the general question of the insurrection, which manifested a bias, or predetermination, that ought never to be felt by a juror."

In *Munroe* v. *The State of Georgia* (5 *Geo. R.*, 85), it was decided : " Whenever the objection to the juror would be good cause of challenge for favor, if discovered in time, it will be ground for a new trial, if not found out until after verdict." (*See page* 140, 5 *Geo. R.*)

The opinion in the case just cited was by LUMPKIN, J., and is a very elaborate one. After careful review of the cases, on page 142 he adds : " And these decisions are all right. The law requires that jurors should be *omni exceptione majōres,* not liable to objection on account of malice, ill will, hatred, revenge, prejudgment or the like. If they are under any of these influ-

ences, they are certainly improper jurors to try a citizen for life."

Again, on page 144, he says: "But for the apprehension of extending this opinion to an unreasonable length, I would notice the few other cases to be found in the books seemingly adverse to the doctrine which we propose to establish. · They will be found to turn on other points, and, when rightly understood, to strengthen our position."

In the *State* v. *Hopkins* (1 *Bay, S. C., p.* 373), the motion was founded upon a single affidavit, and the affiant was shown to be a man of bad character:

"The court, after hearing the arguments, were of the opinion that the matter of fact set forth in the affidavit, if true, was a good cause for a new trial, and it would be difficult to say it was not so, even if the character of the witness was of a suspicious nature. At all events, it was a doubtful point; in which case it was the duty of the court to lean on the merciful side, and give the prisoner another chance for a fair trial. New trial granted."

In *Toxdale* v. *The State* (9 *Hum.* [*Tenn.*] *R.*, 411), the syllabus of the reporter is as follows: "Indictment for murder. There was a verdict of guilty, and, on motion for a new trial, two affidavits were presented. One affidavit showed that some months before the trial, Shelton, one of the jurors who tried the case, stated that from the best information he could get the defendant ought to be hung for the offense with which he was charged. The other affidavit showed that some three or four months before the trial the same juror stated that, according to his information, the defendant ought to be punished, or would be punished for the offense with which he was charged. Shelton stated in his examination that he had not formed or expressed an opinion. The court holds, upon this state of facts, that Shelton had prejudged the case, and that the defendant was entitled to a new trial.

This court will see that the court goes no further in the case cited than this court is asked to decide: First. The opinion was not a decisive one. He admits it to be founded

only on information. Second. It was proved by only two affidavits, whilst we have four. Third. The last opinion was expressed some three or four months before trial, and is proved by only one affidavit. In our case the juror expressed his "conviction" during the week of the trial, and his expressions are proved by three affidavits.

In *Busick* v. *The State of Ohio* (19 *Ohio R.*, 198), the court decided: "If a juror, when interrogated, says he has formed no opinion respecting the guilt or innocence of the accused, and after verdict it appears that before the trial he had said 'if he, the prisoner, is not hung there is no use of laws,' a new trial should be granted."

In *Cody* v. *The State* (3 *How.* [*Miss.*] *R.*, 27), the reporter's note is: "It was held good ground for a new trial that one of the jurors, after he was summoned and before trial, declared that should he be of the jury, he did not think he could clear the accused, but would be bound to find him guilty."

This same doctrine is maintained in *Cain* v. *Cain* (1 *B. Munroe* [*Ky.*] *R.*, 659).

In *Vernum* v. *Hanwood* (1 *Gilman* [*Ills.*] *R.*, 659), the court granted a new trial, because one of the jurors had expressed an opinion, and they say: "The doctrine on this subject, as laid down in the cases of *Smith* v. *Eames, Gardener* v. *The People, and Sellers* v. *The People* (3 *Scam. R.*), is reaffirmed."

In *Bishop* v. *State* (9 *Georgia R.*, 121), it was decided: It is ground for new trial, if one of the jurors, before the trial, makes declarations which clearly indicate that he is not above all exceptions, and that his opinion is not a hypothetical one, dependent upon the whole proof, but formed exclusively in reference to the evidence which should be adduced on the part of the prosecution."

In *Presbury* v. *The Commonwealth* (*Court of Appeals of Kentucky*, 9 *Dana R.*, 203), on page 204, EWING, J., says: "If the objection goes to the moral capacity or impartiality of the juror, or to any matter which goes to impeach the fairness or impartiality of the verdict, if not discovered until after verdict, it would no doubt be as good ground for a new trial as a cause

of challenge before. But when the objection rests upon technical ground, as the want of property, alienage, or the like, not at all affecting the moral capacity, or impartiality of the triers, or the justice of the verdict, we cannot admit that this rule applies."

The same rule also prevails in England.

In *Dent* v. *The Hundred of Hertford*, reported in *Salk. R.*, page 645, the case is there stated: "A new trial was granted upon affidavit, that the foreman declared the plaintiff should never have a verdict, whatever witnesses he produced."

In *Sir George Wynn* v. *Bishop of Bangor* (2 *Comyn R.*, 601), which was an action of ejectment, "after verdict for the plaintiff, it was moved for a new trial on several affidavits showing, * * * * * * secondly, that one of the jurors declared at the view, that by what he had seen (before the shower for the defendant had shown) they should soon determine the dispute; and afterwards, upon the day before the trial, he said Sir George Wynn was a neighbor, and right or wrong he would give it for him; and for these reasons the court granted a new trial."

In *Cancemi* v. *The People* (16 *N. Y. R.*, 501), STRONG, J., on pages 504, 505, says: "The right secured by law to a fair and impartial jury, with minds open to receive and weigh the evidence, and balanced to the matters to be tried, is of the highest importance, and should be carefully guarded by the courts, especially in cases involving human life."

V. But it may be said that the juror (Shaw) denies that he used the expressions attributed to him. To that we answer, that little or no weight should be given to his contradiction.

In *People* v. *Eastman* (3 *Park. Cr. R.*, 25), SELDEN, J., on page 49, says: "In the case of *Taylor* and *Webb* which arose in 1853, a motion was made to set aside the verdict because some writings had been delivered to the jury by a stranger. Lord Hale, who was counsel in the case and opposed the motion, produced the affidavit of the foreman of the jury that they had not looked at the writings. But the court refused to listen to the affidavit. ROLLE, Ch. J., said: "The affidavit

of the jury ought not to be allowed to make good their own verdict; for now they are, as it were parties, and have offended and should not be allowed by their own oath to take off their offense? (*Trials per pais*, 225; *Viner's Abr., Trial*, 458, *pl.* 6.) But, notwithstanding this early decision, it has, no doubt, been the practice of the courts to receive the affidavits of the jurors themselves in answer to a charge of irregularity or abuse. They have, however, generally been considered as an unreliable species of evidence. · In *Commonwealth* v. *McCaul* (*supra*), WILSON, J., says: "From the mode on which collusion and tampering is generally carried on, such circumstances are generally known to no person except the one tampering and the one tampered with, or the persons between whom a conversation might be held which might influence a verdict. If you question either of these persons on the subject, he must criminate or declare himself innocent, and you lay before him an inducement not to give correct testimony."

In the case of *Hines* v. *The State* (8 *Humph. R.*, 597), the court says: "The only witness who gives any explanation whatever, is the offending juror. This affidavit, it is true, excludes the possibility that he was tampered with, if his testimony shall be deemed sufficient to establish the fact. But we do not think this affidavit can be relied on as proof of the innocence of his conduct."

*D. M. Dewitt* (District Attorney), for the People.

I. This case is in this court by virtue of the writ of error only, and not by virtue of any notice of motion. Even if additional affidavits might be read, they are read upon the argument after return to the writ, and not upon original motion. (*Eastwood* v. *People*, 3 *Park. Cr. R.*, 25.)

1. The claim is unheard of anywhere, that the general term have the power to set aside a conviction in the Oyer & Terminer upon *motion* made in the first instance. The statute prescribes the mode of reviewal in criminal cases, and that is by writ of error or *certiorari*.

2. The cases cited by the counsel for the prisoner to show that

Willis *v.* The People.

this court can grant a new trial directly upon motion, are not in the least degree analogous to the case now before the court.

They are cases where the court interfered to regulate special proceedings under a special statute. There is no pretense that this court could set aside a verdict of a jury even in a civil case, upon motion made to it in the first instance ; much less in a criminal case.

II. The affidavits printed in the appendix to the error book, cannot be considered by this court.

They form no part of the return to the writ of error; they were · used · upon a motion to this court, which was denied because of want of jurisdiction to entertain it, and were filed with the clerk of this court. The motion to set aside the verdict made in the Court of Oyer and Terminer, was heard on affidavits which now appear in the bill of exceptions; that court decided the motion upon those affidavits ; to that decision the prisoner's counsel excepted ; and even if this court have the power to review that decision, they should review it as made upon the affidavits read in the court below, and not upon additional affidavits, which the Oyer and Terminer never heard.

If such were the practice, no conviction for a capital crime could stand.

1. In the case of *Eastwood* v. *The People* (3 *Park. Cr. R.*, 25), relied on by the counsel for the prisoner, there was no *objection made* to the reading of affidavits upon the argument, nor was it objected that the decision of the Oyer and Terminer could not be reviewed on writ of error. (*Vide note, p.* 27.)

It also appears that the irregularities complained· of were conceded by the counsel for the people, both in the motion to the Oyer and Terminer and in the court above, and that the only issue was whether or not those irregularities constituted sufficient cause for granting a new trial.

This probably is the reason why no objection was made to the reading of the affidavits.

And this case is in direct conflict with decisions both prior

and subsequent, and was expressly referred to in the opinion of HOGEBOOM, J, in the case of *Hartung* v. *The People* (4 *Park. Cr. R.*, 331), as of no authority, because no objection was made to the reading of the affidavits.

2. Even before the adoption of the Revised Statutes, it was never pretended that affidavits might be read showing irregularities which did not appear upon the record.

The practice, then, was to allege diminution, and pray for a *certiorari.* (*Pelletreau* v. *Jackson,* 7 *Wend.,* 478; *Lambert* v. *The People,* 7 *Cow. R.,* 103.) Such, it would seem, is the practice at the present time. (*McGuire* v. *The People,* 2 *Park. Cr. R.,* 148; *Cancemi* v. *The People,* 18 *N. Y. R.,* 133.)

But a *certiorari* would bring up nothing but the affidavits used in the court below, and its decision upon them. How, then, can other affidavits be addressed to this court?

III. The exception to the charge of the justice is frivolous on its face.

IV. "At common law, the only mode of redress for errors occurring on criminal trials was by motion for a new trial in the court where the trial was had, unless the error was in some matter which formed part of the record when it might be reviewed after judgment by writ of error. Bills of exception, by which questions of law, made and decided on such trials, may be brought up and reviewed in a higher court, were unknown to the common law, although now allowed by a statute of this State. But the statute is limited to exceptions taken on the trial of the main issue, and does not reach such as are made on the trial of a preliminary or collateral question.

"The words are: 'On *the trial* of any indictment, exceptions to any decision of the court may be made by the defendant in the same cases and manner provided by law in civil cases.'" (*Freeman* v. *People,* 4 *Denio R.,* 21; 2 *R. S.,* 736, §21.)

1. The same doctrine was held in the following cases: *People* v. *Haines* (11 *Wend. R.,* 561); *People* v. *Dalton,* 15 *Wend. R.,* 583); *Wynehamer* v. *People* (2 *Park. Cr. R.,* 382).

2. This court, at general term in this district, in two several cases, has expressly adjudged this question against the pris-

oner. (*People* v. *McCann*, 3 *Park. Cr. R.*, 272; *Hartung* v. *People*, 4 *Park. Cr. R.*, 319, 329, 332, 342, *op.*; also in *People* v. *McMahon*, 2 *Park. Cr. R.*, 663.)

3. These authorities show not only that the exception is unavailable, but that the affidavits and the decision of the motion should be stricken from the bill of exceptions and entirely disregarded. No formal motion for this purpose is necessary.

V. If the preceding views are erroneous, the Court of .Oyer and Terminer having denied the motion upon the *merits*, this court should not disturb its decision.

The opposing affidavits fully meet every accusation in the moving papers.

1. The power of the Court of Oyer and Terminer to entertain the motion has never been doubted. (*Wharton's Am. Cr. Law*, § 3061, *note t; Rex* v. *Fowler*, 4 *B. & Ald. R.*, 273; *People* v. *Hartung*, 8 *Abb. Pr. R.*, 132; *People* v. *Wilson, Id.*, 137; *People* v. *Carnal*, 1 *Park. Cr. R.*, 256.)

In the case of *Quimbo Appo*, the Court of Appeals simply decided that the Court of Oyer and Terminer has no power to grant a new trial upon the merits after a conviction for felony. (*Quimbo Appo* v. *People*, 20 *N. Y. R.*, 531, 553.)

2. It is eminently proper that the power to grant new trials in criminal cases on the ground of irregularities occurring. at the trial, should reside exclusively with the court in which the trial is had, and that its decisions should be final. No justice will deny a motion for a new trial where there have occurred irregularities so flagrant as to work manifest injury to the prisoner. The whole facts are before him, the good faith of the motion, the accused juror, as in this case, the possibility or impossibility of injury to the prisoner, the credibility of the persons making the charges—all these are immediately within view of the court, and render it abundantly competent to decide the question.

Should such decision be subject to reviewal and reversal in this court, there is no capital conviction but what may be shaken by affidavits made by parties unknown to the court

and the prosecuting attorney, and gathered together by a felon under sentence of death, as the last effort of his despair.

Should the justice in the court below be guilty of palpable injustice to the prisoner in denying such a motion, the prisoner has an ample remedy in the invocation of the pardoning power.

The cases cited by counsel under his fourth point, are cases where the motion was made to the court where the trial was had.

2. This is no case where this court would be justified in overriding the practice in order to grant relief to an injured man. No crime could be more clearly proven; and the fact that no injury has been done the prisoner, is not less clearly apparent.

VI. The decision of the Court of Oyer and Terminer, denying the motion for a new trial, was just and right.

1. The affidavit of Felter, read on the motion, is not positive, but to the "best of deponent's recollection," and speaks of a casual conversation which took place, as he alleges, six months before. It is positively denied by Shaw's own affidavit.

2. The conversation related in the affidavit of Houghtaling and Jones is sufficiently explained by the affidavit of Shaw. An opinion expressed based upon the hypothesis that the prisoner be proven guilty, is no ground even for challenge.

3. It should be borne in mind that it was universally known and admitted that Willis killed Mrs. Phelan; that the only defense proposed to be set up was that of the temporary insanity of the prisoner; and that in these alleged conversations the question of insanity was not discussed, but simply the fact of the homicide.

A preadjudication, by a juror, of the guilt of the accused of the deliberate killing of the deceased, when that fact is admitted and the whole case hinges upon the question of insanity, upon which the juror never had an opinion, would certainly form no ground for setting aside a verdict.

VI. Admitting the truth of the accusations brought against

Willis *v.* The People.

the juror, still there is no sufficient cause for setting aside the verdict.

1. There is no case in this State where a verdict has been set aside on that ground. The present is not such a case as would warrant the court in establishing a precedent for so doing. The juror, according to the minutes of the reporter, was not asked whether he had ever formed or expressed an opinion.

Even if the juror had, in an unguarded moment, in the heat of discussion, made use of the expression attributed to him, yet if at the time he was sworn his mind was unbiassed and open to conviction, he was a competent juror, and his former indiscreet avowal could work no injury to the prisoner.

2. There is no pretense that there was any malice against the accused, or any deliberate intention to injure him, in the breast of the juror. The justice who presided at the trial had ample evidence of this, in his appearance and demeanor. Should the court conclude to consider the affidavits in the appendix, the want of malice is made still more plainly apparent.

And yet if there were no malice or intention to injure, then the juror, when he took his seat, must have sincerely believed himself unprejudiced, or in his own words, " did not think " what he had heard " had inclined his belief in the matter."

A reference to the opinion in the case of *Flannagan* v. *State* (7 *Watts & Serg. R.*, *p.* 415), cited by the counsel, will show how careful that court was in dealing with motions of this kind.

3. It would be a dangerous practice to establish, that in any capital conviction, no matter how clearly the crime may be proven, the prisoner has only to procure one or two affidavits accusing one of the jurors, to secure at least a new trial and a postponement of his awful punishment.

Preadjudication is a charge very easily made, very difficult of refutation. The setting aside of verdicts in capital cases on such ground, unless it amount to flagrant injustice, malice be plainly apparent, and the fact be conclusively established, strikes at the very foundation of the jury system.

*By the court,* INGALLS, J.    Two questions are presented for
consideration.    One arises upon the charge of Justice PECK-
HAM, and the portion excepted to is as follows: "That a man
is not insane who knows right from wrong; who knows the act
he is committing is a violation of law and wrong in itself."
In giving effect to that branch of the charge, it is proper to
consider other portions which accompanied it.    The learned
justice charged the jury as follows: "A person is not insane,
surely, who knows right from wrong, and who knows that the
act he is committing is a violation of law and is wrong in
itself.    If he is conscious that the act is wrong at the time he
is committing it, that is a violation of law; that is a violation
of the law of the land; he cannot be said to be insane.    If,
however, at the time he commits the act, he is under a delu-
sion, he does not know right from wrong; he does not know
that the act he commits is an offense; he does not know it was
wrong; but is under a delusion in regard to it; why, surely,
he is not responsible for his acts, he is an insane man."    I fail
to discover wherein the charge in that respect is not quite
favorable enough to the prisoner.    The test furnished by the
charge, and by which the jury were to be governed in deter-
mining whether or not the prisoner was insane, was strictly in
accordance with the law. (*The People* v. *Pine,* 2 *Barb. R.,* 566.)
Justice BARCULO, at page 572, says: "A simple and sound
rule may be thus expressed.    A man is not responsible for an
act when, by reason of voluntary insanity or delusion, he is,
at the time, incapable of perceiving that the act is either wrong
or unlawful."    In the same opinion, reference is made to the
rule as laid down by Chief Justice SHAW, of Massachusetts,
as follows; "A man is not to be excused from responsibility,
if he had capacity and reason sufficient to enable him to dis-
tinguish *between right and wrong* as to the particular act he is
then doing.    A knowledge and consciousness that the act he
is doing is wrong and criminal, will subject him to punish-
ment." (*Freeman* v. *The People,* 4 *Denio R.,* 28.)    BEARDSLEY,
J., says: When insanity is interposed as a defense to an indict-
ment for an alleged crime, the inquiry is always brought down

Willis *v.* The People.

to the single question, of a capacity *to distinguish between right and wrong when the act was done.* The mode of putting the question to the jury on these occasions has generally been, whether the accused, at the time of doing the act, *knew the difference between right and wrong;* which mode, though rarely, if ever, leading to any mistake with the jury, is not deemed so accurate when put generally and in the abstract, as when put with reference to the party's knowledge of right and wrong in respect to the very act with which he is charged." (2 *Greenl. Ev.*, § 372.) "The rule of law is understood to be this, that a man is not to be excused from responsibility, if he has capacity and reason sufficient to enable him to *distinguish between right and wrong as to the particular act he is then doing.*" (*See also Dean's Med. Jurisp.*, 549, 550, 551; *Beck's Med. Jurisp.*, 588.) No error was committed in the charge; it is fully sustained by the authorities cited; and the exception thereto, not being well taken, must fail.

The remaining question to be considered is, whether Smith H. Shaw was a competent juror? On the part of the prisoner, it is insisted that he had formed and expressed an opinion unfavorable to the prisoner previous to the trial, which rendered him incompetent to serve, and which fact did not come to the knowledge of the prisoner or his counsel previous to the verdict. It is insisted, on the part of the people, that that question cannot now be raised upon affidavits and considered by this court. The practice has not been uniform as to the manner in which such alleged irregularities are to be brought before this court for review. The Oyer and Terminer properly decided that they had not the power, in such cases, to entertain the motion and grant a new trial. (*Quimbo Appo* v. *The People*, 20 *N. Y. R.*, 331.)

Where there has been a conviction, and sentence is suspended in order to take the opinion of the court at general term, the proceedings are removed to this court by writ of *certiorari*. (2 *Rev. Stat.*, 736; *Hill* v. *The People*, 10 *N. Y. R.*, 463; *The People* v. *Townsend*, 1 *Johns. Cas.*, 104; *The People* v. *White*, 22 *Wend. R.*, 167; *Colt* v. *The People*, 1 *Park. Cr.*

*R.*, 612 ; *The People* v. *Hulse*, 3 *Hill R.*, 310.) In the last case there was a bill of exceptions. (*The People* v. *Shorter*, 4 *Barb. R.*, 460 ; *The People* v. *McKay*, 18 *Johns. R.*, 212.)

Where there is a conviction and judgment, the proceedings can only be removed into this court by writ of error, and when the irregularity complained of is of such a nature that it cannot be properly embraced in the return to the writ of error, but the same has become part of the proceedings, a writ of *certiorari* may also issue to bring up such proceedings, involving the alleged irregularity. (*Rev. Stat.*, 2d ed., vol. 2, *p.* 599, § 45; *Cancemi* v. *The People*, 18 *N. Y. R.*, 133 ; *Stephens* v. *The People*, 19 *Id.*, 551 ; *McGuire* v. *The People*, 2 *Park. Cr. R.*, 148.) But where the irregularity complained of has not been introduced into the record or proceedings, so as to constitute it a proper subject to be returned to the writ of error or *certiorari*, I think affidavits may be read upon the argument after the writ of error has been returned, but not before, as this court acquires no jurisdiction of the matter, so as to entertain a motion for a new trial until such return. (*Eastwood* v. *The People*, 3 *Park. Cr. R.*, 25, *note, p.* 27 ; *The People* v. *Hartung*, 8 *Abb. Pr. R.*, 132 ; *The People* v. *Wilson*, *Id.*, 137.)

The case of *Hartung* v. *The People* (4 *Park. Cr. R.*, 319) is cited by the district attorney. That case decides that such alleged irregularities are not the subject of review on exception or writ of error, and such is undoubtedly the law ; but it does not necessarily follow that this court may not entertain a motion upon affidavits to correct an error arising out of an irregularity prejudicial to the rights of a prisoner, and when he has no other legal mode of redress.

It is true, the learned justice who delivered the prevailing opinion, questions the expediency of considering such questions at general term, but finally allowed the matter objected to to remain. Since the decision of the last cited case, the case of *Quimbo Appo* v. *The People* (20 *N. Y. R.*, 531) has been decided, in which I understand the Court of Appeals to decide that a Court of Oyer and Terminer has not the power to grant a new trial. SELDEN, J., at page 552, refers to the

Willis *v.* The People.

practice which had been pursued in the Supreme Court where questions of irregularity had been brought into that court for review. No motion has been made to suppress any of the matter contained in the printed case. I conclude that this court may, upon the affidavits, consider this question of alleged irregularity.

A conviction will not be set aside and a new trial granted, where it is apparent that no injury has resulted to the prisoner from the irregularity complained of. Neither justice nor a proper exercise of humanity, even in a capital case, demands such a determination.

*The People* v. *Ransom* (7 *Wend R.*, 414), SUTHERLAND, J., says: "The conclusion from these cases appears to me to be this: That any mere informality or mistake of an officer in drawing a jury, or any irregularity or misconduct in the jurors themselves, will not be sufficient ground for setting aside a verdict, either in a *criminal* or civil case, where the *court are satisfied that the party complaining has not or could not have sustained any injury from it.*" (*See, also, The People* v. *Hartung,* 17 *How. Pr. R.,* 85; *The People* v. *Carnal,* 1 *Park. Cr. R.,* 256; *Taylor* v. *Everett,* 2 *How. Pr. R.,* 23; *Baker* v. *Simmons,* 29 *Barb. R.,* 198.)

On behalf of the prisoner, the affidavit of William H. Felter is produced, in which he states that in the month of November, 1863, Shaw (the juror), in a conversation with him, "warmly contended that the said Willis should suffer death for the alleged offense, and if he (Shaw) was on the jury which tried him, he would certainly hang him." This affidavit purports to have been taken April 23, 1864.

The printed case contains another affidavit of said Felter, which purports to have been taken on the 2d day of April, 1864, in which he states as follows: "That the said Shaw *mainly contended* that said Willis should suffer death for the alleged offense; and, *according to deponent's best recollection,* said that if he (Shaw) was on the jury which tried him, he would certainly hang him." It will be observed that in this affidavit Felter qualifies his statement, and does not undertake

to speak with certainty; but in the affidavit which was made at a later period, he undertakes to speak without qualification, and without accounting for his improved memory. The joint affidavit of Henry H. Jones and Hyman Houghtaling is also produced, in which they state as follows: "That the said Shaw, in the course of the conversation, *gave it as his opinion* that the said Willis ought to and should suffer death for the killing of Mrs. Mary Phelan, for which he then stood indicted for murder; that said Shaw did not qualify his opinion by saying that if he (Willis) was found guilty he ought to suffer. death, or be punished, but he expressed himself clearly and positively that the said Willis was guilty, and should suffer death for the act." This affidavit purports to have been taken on the 2d day of April, 1864.

In the other joint affidavit of Jones and Houghtaling, contained in the printed book, and which purports to have been taken on the said 2d day of April, 1864, they state as follows: "That said Shaw gave it *as his opinion* that said William Willis deserves to and ought to suffer death for the act which he had committed." In neither affidavit do they undertake to give the language used by Shaw, but merely state that *he gave it as his opinion*, leaving it for the court to adopt the conclusion of the witnesses as to the substance of such opinion.

The affidavit of Andrew Layman is also produced, in which he states that he was present at the conversation referred to in the affidavit of Jones and Houghtaling, and states further as follows: "That the statement therein of the conversation of the said Jones and Houghtaling is in all respects correct; that deponent well remembers that the said Smith H. Shaw did not in any way qualify his opinion, but expressed his clear and *decided conviction* that said Willis was guilty, and deserved to and should suffer death." In this affidavit, Layman merely adopts the statement of Jones and Houghtaling, and does not undertake to give the language used by Shaw, but merely his conclusion deduced therefrom. This criticism upon the affidavits seems justified, as Shaw expressly denies having made any such statement, or having expressed any

Willis *v.* The People.

such opinion as is attributed to him in these affidavits. The affidavit of Smith H. Shaw (the juror) is produced, in which he expressly denies having the conversation with Felter to which he refers, or any conversation with him in relation to Willis. In regard to the statements contained in the affidavits of Jones, Houghtaling and Layman, he states that he was in the shoe shop, and heard Jones and Houghtaling discussing the case of Willis, and that they continued such discussion nearly all the time he was in there; that Jones asked him (Shaw) if he was going to attend the trial; to which he replied, that he thought he should. He further states as follows: "That he does not recollect of saying anything whatever in relation to Willis while in the shop; deponent might have said that if the prisoner was guilty, he ought to be punished, or something to that effect, *but deponent is positive* that he never while in the shop, or at any other place or time, *give it as his opinion that Willis ought to suffer death, or was guilty of the crime with which he was charged.* He further states: "Deponent further says that he, deponent, never at any time, or in the presence or hearing of any person, prior to his being sworn, formed or expressed an opinion in regard to the guilt or innocence of the said William Willis. That when he entered the jury box he was entirely free from any bias or prejudice against the prisoner, and was prepared to render, and did render a verdict according to the evidence, independent of anything he had heard or read before, in regard to the homicide." It appears from the affidavit, that the relations between Shaw and the prisoner were of the most friendly character. Shaw was in the habit of visiting the prisoner after his confinement, loaned him the use of tools, and purchased leather for the prisoner, to enable him to manufacture harness, to raise money to defray the expenses of his defense; and further, directed his men to do certain work upon the harness, which the prisoner could not do in the jail, and for all of which he made no charge. The affidavit of DeWitt C. Davis supports a portion of the affidavit of Shaw. If inferences were to be indulged, based upon the relations

which existed between Shaw and the prisoner, they certainly would be that Shaw inclined favorably rather than prejudicially toward the prisoner.

.. The affidavit of John Lyon is also produced, in which he states that he had been in the employment of Shaw for the period of two years, and boarded in his family, and was almost constantly with him during the day; that he had heard him speak in a friendly manner of Willis, but had not heard Shaw express any opinion as to the guilt or innocence of the prisoner prior to his acting as a juror; that on one occasion the son of Shaw remarked that Willis ought to be hung; that his father reprimanded him, and told him every man was presumed innocent until he was found guilty, and that he ought to wait and hear the result of the trial before he made such assertions. The affidavit of George H. Shaw (the son) is also produced, in which he concurs in the statement contained in the affidavit of Lyon. There is also the affidavit of Richard Voorhees, who states that he worked in the shop with Shaw, and by his side, and boarded in his family; that he never heard Shaw express any opinion as to the guilt or innocence of Willis, or say that he ought to be hung, or anything to that effect.

. The affidavit of Henry H. Holden contains the following statement: "That he was foreman of the jury on the trial of William Willis; that the jury, after retiring, individually agreed upon their verdict; that there was not the slightest difference of opinion among the jurors about the guilt of Willis; that Smith H. Shaw had no influence in the deliberations of the jury, and took no part in the rendering of the verdict, except giving his assent thereto."

From a careful examination and consideration of all the facts upon which this alleged irregularity depends, I have come to the conclusion that the case of the prisoner was not in the slightest degree prejudiced by any opinion formed or expressed by the juror Shaw; and that he was in all respects a competent juror. During the examination of this case, I fully appreciate the consideration pressed upon the court, that the life of the prisoner is involved in the determination, and have

pursued the investigation, actuated by a conscientious desire to arrive at a just and proper conclusion. And while indulging a proper degree of sympathy for the prisoner, and watchfulness of his rights, have endeavored not to lose sight of the other consideration, that the administration of public justice demands of the court a firm and faithful execution of the law. The judgment of the Oyer and Terminer must be affirmed, and the record and proceedings remitted to that tribunal with directions to enforce the judgment by this court.

Judgment affirmed.[1]

---

[1] NOTE. — This judgment was affirmed by the Court of Appeals, at June term, 1865.